# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

JOE T. YOUNG,

    Plaintiff,

    v.                                    CV 2:18-022

DAVID BRADY,

    Defendant.

## ORDER

Plaintiff filed this action <u>pro se</u> seeking damages under 42 U.S.C. § 1983. Dkt. No. 1-1 at 12-14. Before the Court are Plaintiff's First Motion for Summary Judgment, dkt. no. 5, and Second Motion for Summary Judgment, dkt. no. 19, and Defendant's Motion for Summary Judgment, dkt. no. 21. These motions have been fully briefed and are ripe for review. For the reasons stated below, factual disputes preclude summary judgment in favor of either side. The motions, at this time, are **DENIED**.

## BACKGROUND

Plaintiff had an encounter with Defendant David Brady at Sidney Lanier Park in Brunswick, Georgia. Dkt. No. 21-1 ¶ 1. Defendant David Brady is a Game Warden in the "Law Enforcement Division of the Georgia Division [sic] of Natural Resources (DNR) in Region 7, based in Brunswick, Georgia." <u>Id.</u> ¶ 2.

AO 72A
(Rev. 8/82)

**The Encounter**

On August 27, 2017, Plaintiff was sitting in his parked truck with his windows up in a gravel parking lot in Sidney Lanier Park. Dkt. No. 21-3 ¶ 8, 9; "Officer Brady, Body Camera" (Video) at 0:13. The gravel lot had no lines designating parking spots, and there were no vehicles, other than Plaintiff's and Defendant's, parked in that gravel lot at the time Plaintiff was approached by Defendant.  Video at 0:13-0:32; Video at 1:10.  Defendant parked his truck near Plaintiff's and walked to Plaintiff's driver-side window.  Id. at 0:12-0:23.  When Plaintiff was approached by Defendant, he was relaxing in the driver's seat of his truck. Dkt. No. 21-5 at 28.[1]  When Defendant got to Plaintiff's window, he asked plaintiff if he was "okay" and told him to "roll your window down." Video 0:21-0:24.  Plaintiff waived Defendant off and drove forward, dkt. no. 21-5 at 29, video at 0:23-0:28; as soon as the truck started moving, Defendant struck Plaintiff's window with his

---

[1] Plaintiff was deposed by Defendant.  Dkt. No. 21-5.  During the deposition, Plaintiff read portions of his complaint verbatim after being asked to describe in his words what happened.  Id. at 26-29.  While the Complaint is not evidence, the testimony that Plaintiff gave in his deposition detailing under oath facts relating to the incident in question is evidence that the Court must consider at this stage in the proceeding, even if the factual allegations in the deposition were repeated verbatim from the Complaint.  Darwin v. Nicholson, 221 F. App'x 918, 920 (11th Cir. 2007) ("Depositions generally are admissible provided that the party against whom they are admitted was present, represented, or reasonably noticed, pursuant to Rule 32(a) of the Federal Rules of Civil Procedure.  Moreover, depositions are specifically allowed in consideration of summary judgment." (citation omitted)).

AO 72A
(Rev. 8/82)

hand, video at 0:24-0:25. For the time period (approximately three seconds) that the video showed Plaintiff's truck moving, Plaintiff's brake lights were activated. Id. at 0:25-0:27. Defendant immediately returned to his truck and pursued Plaintiff. Id. at 0:26-0:34. The pursuit did not last long, less than thirty seconds elapsed from the time Defendant put his truck in drive to when he put it back into park, behind Plaintiff's truck. Id. at 0:35-1:03. At some point, Defendant activated his vehicle's blue emergency lights. Id. at 3:00-3:01 (showing that the vehicle's blue emergency lights were activated).

Again, Defendant got out of his truck and approached Plaintiff. Id. at 1:09-1:26. Immediately after Defendant exited his truck, Plaintiff asked Defendant "are you stopping this truck?" Id. at 1:12. Defendant responded, "yes sir, I am." Id. at 1:13. Defendant then walked toward Plaintiff's driver-side window. Id. at 1:13-1:25. When Defendant was approaching Plaintiff, Plaintiff stated that he "didn't want to talk" to Defendant, that he "ain't done nothing," again that he did not "want to talk to" Defendant, that he "remain[s] silent" and has not "done nothing," and he requested that Defendant "keep [his] hands off his weapon." Id. When Defendant got to Plaintiff's truck, he asked Plaintiff for his driver's license. Id. at 1:29. Plaintiff repeated much of what he had just said. Id. at 1:29-1:44. Defendant then requested twice that Plaintiff step out of Plaintiff's vehicle. Id. at 1:44-

AO 72A
(Rev. 8/82)

1:47.   Plaintiff responded by asking why Defendant wanted to see his driver's license, and Defendant responded, "because you're sitting over here sleeping" before he was cut off by Plaintiff, who stated that "sleeping's not a crime." Id. at 1:47-1:53.

Defendant finally got Plaintiff to step out of the vehicle: Defendant opened Plaintiff's door, and Plaintiff exited his truck on his own power, without any assistance from Defendant. Id. at 1:58-2:07.   After about a minute of back-and-forth between Defendant and Plaintiff, Defendant handcuffed Plaintiff. Id. at 2:07-3:10.   Defendant contended that he was putting Plaintiff in handcuffs for Defendant's safety. Id. at 3:06-3:10.   Defendant retrieved Plaintiff's wallet from his pants pocket and removed his driver's license from the wallet. Id. at 3:19-3:47.   Defendant called in the driver's license over his radio. Id. at 4:39-4:47. Soon after, Defendant communicated to Plaintiff that he was "not under arrest right now" but that he was only "being detained." Id. at 5:10-5:13.

About a minute later, Defendant gave the second in a series of explanations for his encounter with Plaintiff,[2] telling Plaintiff that "the reason [he] pulled up to [Plaintiff] was because you're underneath a bridge.   I was checking on your welfare." Id. at 6:20-6:25.   Plaintiff interrupted Defendant at

---

[2] The first explanation was that Plaintiff was "sitting over here sleeping." Video at 1:47-1:53.

this point, before Defendant continued, "I walked up to the vehicle. You put it in drive and took off." Id. at 6:26-6:34. A little later, Defendant informed Plaintiff that his "sleeping bag was sitting on the back of the truck, too." Id. at 7:18-7:20. Plaintiff told Defendant that he was letting it dry off, and Defendant replied "okay." Id. at 7:21-7:27. Plaintiff was soon after unhandcuffed. Id. at 8:18-8:27. Defendant then said, "if you want to roll off that's fine, you might want to grab your sleeping bag." Id. at 8:48-8:52. Plaintiff was free to go and soon after drove away. Id. at 10:14.

Throughout the encounter, Plaintiff's truck bed was covered by a tarp. Id. at 0:21. The tarp did not sit down onto the floorboard but was flat across the truck bed and even with the top of the truck bed's siding; it appears that the tarp was laying on top of a hard covering. Id. On top of the tarp was a sleeping bag that was flat and unfurled, with the top of the sleeping bag near the back window of the truck and the bottom near the truck's tailgate. Id. at 0:21, 2:45, 2:57.

### Plaintiff's Injury Allegations

On August 21, 2017, six days prior to the encounter, Plaintiff had a medical procedure to address a hernia. Dkt. No. 21-1 ¶ 33. As part of the procedure, Plaintiff had sutures. Id. ¶ 34. During the encounter with law enforcement, at least some of the sutures came out. Id. ¶ 35. Plaintiff testified that he suffered a week

5

or two of pain because the sutures pulled out during the encounter. Dkt. No. 21-5 at 49. Plaintiff did not know exactly when they came out, but he testified that it was likely when he exited the truck at Defendant's insistence. Id. at 54. Nevertheless, Plaintiff exited his truck under his own power as Defendant did not touch Plaintiff or aid him in anyway. Dkt. No. 21-1 ¶ 16. Plaintiff also testified that he suffered from emotional distress due to the encounter. Dkt. No. 21-5 at 52-53. Plaintiff testified that as a result of the encounter he was embarrassed, id. at 49, traumatized, id. at 52, and shocked, id. at 57-58, and that during the encounter he was afraid of getting shot, id. at 54.

## Palmetto Berries

Brian Clavier is the Chief of Law enforcement for the Georgia Forestry Commission. Dkt. No. 44-2 ¶ 1. One of his duties in this role is to coordinate with the Georgia Department of Natural Resources investigations into the unauthorized harvest of palmetto berries in Georgia. Id. ¶ 2. Picking palmetto berries is not per se illegal in Georgia; rather, unauthorized palmetto berry pickers may violate Georgia's criminal trespass statute (O.C.G.A. § 16-7-21) and Georgia's statute for trespassing on DNR property (O.C.G.A. § 16-9-58). Id. ¶ 3. Trespass and theft of berries on state property primarily occurs in Waycross, Georgia, at Dixon State Forest, which is several miles from Sidney Lanier Park in Brunswick. Id. ¶ 4. Trespass and theft of berries on private

AO 72A
(Rev. 8/82)

property occurs throughout the southeast region of Georgia. Id. Palmetto-berry-harvesting season is from August to October, and a large amount of the theft occurs in August when the berries first appear but before the authorized harvesters have begun to harvest. Id. ¶ 5.

The Georgia DNR publishes a weekly report for its law enforcement division that contains "a broad sampling of events that have taken place in the past week." Dkt. No. 44-4 at 2. The weekly report for the week of August 13—August 19, 2017, contains a report of one "palmetto berry bust." Id. at 8. In Brantley/Ware County, on August 14, 2017, a DNR officer contacted another DNR officer and complained of illegal-palmetto-berry picking that was taking place on state property. Id. Two officers began patrolling the area and came into contact with a passenger van that fit the description given by the first officer. Id. The patrolling officers initiated a traffic stop and found approximately 1800 pounds of palmetto berries. Id. The weekly report contains a picture of large bags stuffed full of berries. Id.

Plaintiff, acting pro se, filed this action to recover damages and other compensation, which Plaintiff claims is owed to him under 42 U.S.C. § 1983.

AO 72A
(Rev. 8/82)

## LEGAL STANDARD

As an initial matter, it is well-settled that courts in this circuit must "construe pro se pleadings liberally." Dixon v. Hodges, 887 F.3d 1235, 1237 (11th Cir. 2018).

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the

AO 72A
(Rev. 8/82)

pleadings and present affirmative evidence to show that a genuine issue of fact does exist. <u>Anderson</u>, 477 U.S. at 257.

The nonmovant may satisfy this burden in two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting <u>Celotex Corp.</u>, 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." <u>Morris v. Ross</u>, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

"To prevail on a claim under § 1983, a plaintiff must demonstrate both (1) that the defendant deprived her of a right secured under the Constitution or federal law and (2) that such a deprivation occurred under color of state law." <u>Arrington v. Cobb Cty.</u>, 139 F.3d 865, 872 (11th Cir. 1998), <u>as amended</u> (May 28, 1998). Nevertheless, "the first step in any § 1983 analysis

9

requires identification of the precise right that is alleged to have been violated. Different rights prescribe different legal analyses, so accurately diagnosing the right at issue is critical to properly analyzing a § 1983 plaintiff's claims. And correctly diagnosing the precise right involved, in turn, demands careful consideration of the alleged facts." Alcocer v. Mills, 906 F.3d 944, 947 (11th Cir. 2018).

Plaintiff's Amended Complaint alleges that Defendant falsely arrested and imprisoned Plaintiff in violation of the Fourth Amendment, as incorporated by the Fourteenth Amendment, of the United States Constitution. "The Fourth Amendment, which is applicable to the States through the Fourteenth Amendment, guarantees the right against unreasonable searches and seizures." Brown v. City of Huntsville, Ala., 608 F.3d 724, 734 n.15 (11th Cir. 2010) (citations omitted). "There are three broad categories of police-citizen encounters for purposes of our Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests. With regard to the second category of police-citizen encounters, the Fourth Amendment does not prohibit a police officer in appropriate circumstances and in an appropriate manner from approaching a person for purposes of investigating possible criminal behavior, even though there is no probable cause to make an arrest." United States v. Partin, 634 F. App'x 740, 746 (11th

Cir. 2015) (citation omitted).  Recently, the Eleventh Circuit has discussed a fourth category of police-citizen encounters: traffic stops.  See United States v. Gibbs, 2019 WL 1050884, at *3 (11th Cir. Mar. 6, 2019) ("Under the Fourth Amendment, a police officer generally may lawfully detain an individual without a warrant if (1) there is probable cause to believe that a traffic violation has occurred (a traffic stop). . . .")).  Because Defendant does not argue, and the record contains no evidence, that a traffic violation occurred, this category is not implicated in this case (even though Plaintiff was pulled over while in his truck).

As described by the Eleventh Circuit, a full-scale arrest is a different category of police-citizen encounter than a brief seizure or investigatory detention, i.e., a Terry stop.  Terry v. Ohio, 392 U.S. 1 (1968).  Each category requires a different analysis for determining whether one's constitutional rights have been violated.  Regarding the first category, i.e., a full-scale arrest, a police officer violates the Constitution when he or she arrests an individual without probable cause.  Jones v. Cannon, 174 F.3d 1271, 1283 (11th Cir. 1999) ("An arrest without probable cause is unconstitutional.").  As to the second category, an officer violates the Constitution when he or she detains an individual without reasonable suspicion.  Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000) ("[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop

11

when the officer has a reasonable, articulable suspicion that criminal activity is afoot." (alteration in original) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000))). Here, Plaintiff was told by Defendant that he was being stopped, so he was at the very least detained. The Court must determine, however, whether he was arrested or not; this determination will shape the analysis for whether Defendant violated Plaintiff's constitutional rights.

**I. Plaintiff was not Arrested, but was Briefly Seized as part of an Investigatory Stop**

The Court considers four nonexclusive factors when determining whether a detention was a Terry stop or a full-scale arrest: "(1) the law enforcement purpose served by the detention; (2) the diligence with which the officers pursued the investigation; (3) the scope and intrusiveness of the investigation; and (4) the duration of the detention." United States v. Street, 472 F.3d 1298, 1306 (11th Cir. 2006) (citation omitted). "While restriction on freedom of movement is a factor to be taken into account in determining whether a person is under arrest, it alone is not sufficient to transform a Terry stop into a de facto arrest." United States v. Acosta, 363 F.3d 1141, 1147 (11th Cir. 2004).

The first factor is inconclusive because the law enforcement purpose of the detention is unclear at this point in the record. The reasons evolved well into briefing. Throughout the detention,

Defendant made varying statements relating to the purpose of Plaintiff's detention. First, Defendant stated that Plaintiff was sleeping. Next, Defendant stated that he was checking on Plaintiff's welfare and that when Defendant approached Plaintiff, Plaintiff drove off. Then, Defendant stated that Plaintiff's "sleeping bag was sitting on the back of the truck, too." Video at 7:18-7:20. Later, another motive has been posited in Defendant's briefing in opposition to Plaintiff's motion for summary judgment and in support of Defendant's own motion for summary judgment. That is, Defendant now contends that he was actually investigating whether Plaintiff was engaged in illegal-palmetto-berry harvesting. The last round of briefing indicates that not long before the encounter with Plaintiff there was a person arrested several miles away and a few counties over who trespassed to pick such berries. Given the ambiguity regarding the law enforcement purpose of Plaintiff's detention, this factor is, at best, inconclusive of whether the detention was a full-scale arrest or an investigatory stop.

Furthermore, the second factor is inconclusive because without clarity as to the law enforcement purpose served by the detention, the Court cannot determine the diligence with which Defendant pursued the purpose of the investigation.

Even if the first two factors point to a full-scale arrest, which they do not, the last two factors weigh heavily in favor of

13

an investigatory stop and thus require a finding of the same. The scope, intrusiveness, and duration of the detention make this a Terry stop and not a full-scale arrest. The scope and intrusiveness of the investigation were limited. The most intrusive aspect of the investigation was the handcuffing of Plaintiff and removal of his wallet from his pants. Defendant also radioed in Plaintiff's driver's license number and license plate. This was the limit of the investigation; Defendant did not even ask Plaintiff if Defendant could search Plaintiff's truck or sleeping bag. Lastly, the entire encounter lasted around ten minutes, and Plaintiff was only handcuffed for about five of these minutes. This is a short time frame, and the detention lasted as long as necessary for Defendant to get back word on his radio that Plaintiff did not have any outstanding warrants. Thus, the detention was an investigatory stop and not a full-scale arrest.

**II. Defendant is neither Entitled to Qualified Immunity nor Summary Judgment at this Stage of the Case**

Defendant argues that he is entitled to qualified immunity. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). For qualified

14

immunity to apply, the official must establish that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009) (citation omitted).  If Defendant shows he was acting within the scope of his discretionary authority, then the burden shifts to Plaintiff to "show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009) (quoting Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004)).  Also, the Court is permitted to use its discretion to address the second qualified-immunity prong first, which it does here. Poulakis v. Rogers, 341 F. App'x 523, 525 (11th Cir. 2009).

As an initial matter, Defendant was acting within his discretionary authority throughout the encounter, and Plaintiff has not argued otherwise.  Thus, the burden shifts to Plaintiff to "show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Whittier, 581 F.3d at 1308.

The Court addresses the second prong, whether the right was clearly established, first.  The second prong asks whether the law enforcement officer had "arguable reasonable suspicion" to detain the person as part of an investigatory stop; if the officer did not, then the officer violated clearly established law.  See

15

Poulakis v. Rogers, 341 F. App'x 523, 526 (11th Cir. 2009) (citing
Case v. Eslinger, 555 F.3d 1317, 1327 (11th Cir. 2009)) ("In
wrongful arrest cases, we have frequently framed the 'clearly
established' prong as an 'arguable probable cause' inquiry.   In
other words, we have said that when an officer violates the
Constitution because he lacked probable cause to make an arrest,
the officer's conduct may still be insulated under the second prong
of qualified immunity *if* he had 'arguable probable cause' to make
the arrest.")).   Furthermore, because arguable reasonable
suspicion is a lower standard than reasonable suspicion, if an
officer did not have arguable reasonable suspicion, then the
officer necessarily did not have reasonable suspicion.

Before determining whether Defendant had arguable reasonable
suspicion to detain Plaintiff, the Court must determine at what
point Plaintiff was detained, or "seized."   It is at that point in
time that Defendant must have had arguable reasonable suspicion
for the detention to be constitutional.   "Whether a seizure has
occurred depends on whether a reasonable person, in light of the
totality of the circumstances, would have believed that he was not
free to leave."   United States v. Brown, 700 F. App'x 976, 978
(11th Cir. 2017).   As the United States Supreme Court has
recognized, the subjective intention of an officer to detain a
person had that person attempted to leave "is irrelevant except
insofar as that may have been conveyed to the [person]."   U.S. v.

16

Mendenhall, 446 U.S. 544, 554 n.6 (1980).  Likewise, the inquiry is not whether Plaintiff believed he was free to leave but whether a reasonable person would have such belief under the same circumstances.  Here, a reasonable person would not believe that he is free to leave when a police officer approaches the person's vehicle, hits the driver-side window of the vehicle when the person drives away, immediately pursues the vehicle with the officer's blue, emergency lights activated, exits the police vehicle, and affirmatively answers that he is stopping the person's vehicle. Thus, when Defendant exited his vehicle the second time and confirmed to Plaintiff that he was being stopped, Plaintiff was "seized" within the meaning of the Fourth Amendment.

Turning to the second prong of the qualified immunity analysis, here, the right allegedly violated was clearly established at the time of the alleged violation.  "A law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity.  When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop."  Jackson v. Sauls, 206 F.3d 1156, 1165-66 (11th Cir. 2000).

To determine whether an officer had arguable reasonable suspicion to conduct an investigatory stop, courts "analyze

whether a reasonable officer could have believed that the [seizure] comported with the Fourth Amendment." Brent v. Ashley, 247 F.3d 1294, 1303 (11th Cir. 2001) (internal quotation marks and citation omitted). In other words, "[a]rguable reasonable suspicion exists if a reasonable officer in the same circumstances and possessing the same information could have believed that reasonable suspicion existed." Dowling v. City of Fort Lauderdale, Fla., 2013 WL 76301, at *3 (S.D. Fla. Jan. 4, 2013) (citing Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002)). "In undertaking the arguable reasonable suspicion inquiry, this Court must examine the totality of the circumstances to determine whether an officer had a 'particularized and objective' basis to support his suspicion. Whether the officer's suspicion ends up being mistaken is immaterial so long as it was reasonable." Whittier, 581 F.3d at 1309 (11th Cir. 2009) (citations omitted). "Because the objective-reasonableness test applies to Fourth Amendment, qualified-immunity analysis, courts do not speculate as to what government officials subjectively thought but assess their actions for objective reasonableness under established constitutional law." United States v. Lewis, 674 F.3d 1298, 1315 (11th Cir. 2012).

Defendant, in his supplemental brief, argues that he had arguable reasonable suspicion that Plaintiff had trespassed to pick palmetto berries based on "the time of year (a very short harvesting season when DNR officers are specifically patrolling

AO 72A
(Rev. 8/82)

for illegal harvesting), the location of the encounter (a region of the State that is specifically patrolled for illegal harvesting), the presence of what appeared to be a 'large cloth bag sticking up from the bed of his pickup truck, which appeared to be the type of bag that is used in the illegal harvesting,' and then also [Plaintiff]'s flight upon noticing Defendant Brady's approach." Dkt. No. 44 at 4 (quoting Dkt. No. 21-3 ¶ 10).

According to the Defense, anyone in Southeast Georgia with a bag in their pickup truck during palmetto-berry-picking season can be stopped. Motions Hearing on February 19, 2019, at 10:16:44-10:18:02. Wrong. The Court is well aware of just how low a standard "arguable reasonable suspicion" is. However, a walk through all of the factors shows that law enforcement are not immune from detaining anyone in Southeast Georgia who has a bag in a pickup truck.

First, the observance of an unfurled, flattened sleeping bag in the bed of a parked truck in a public park in the middle of the day is not a particularized and objective basis establishing reasonable suspicion of criminal activity—no matter what berry-picking season it is. Defendant offers no basis for why Defendant's sleeping bag appeared "to be the type of bag used by illegal palmetto harvesters," dkt. no. 21-2 at 10, except for the fact that it was large enough to hold berries. Along this line, even if it were common knowledge that palmetto-berry harvesters

19

store illegally harvested berries in sleeping bags (which it is not), Defendant has not stated why he had a particularized and objective basis for believing that Plaintiff's unfurled and <u>flattened</u> sleeping bag harbored illegally harvested palmetto berries.

In fact, Defendant implicitly admitted at oral argument that, other than the fact that the sleeping bag could hold berries, there was nothing suspicious about the sleeping bag. Notably, it is difficult to evaluate Defendant's position because so many changing reasons were offered for the stop. Nevertheless, Defendant's counsel stated at oral argument that the traffic stop was terminated because Defendant did not see any berries or twigs that might signify that berries were stored in the sleeping bag. The sleeping bag, as shown by the video, was in the same position when Defendant first approached Plaintiff and observed—from an arms-length away (as evidenced by Defendant hitting Plaintiff's window)—Plaintiff drive forward. Therefore, Defendant's purported justification for investigating should have been dispelled when he initially approached Plaintiff's truck and saw no evidence of berry picking. Under these facts, Defendant's observation of a sleeping bag during palmetto-berry-picking season in Southeast Georgia was not a particularized and objective basis for believing that criminal activity was afoot.

AO 72A
(Rev. 8/82)

Second, Defendant argues that the sleeping bag in the truck bed during palmetto-berry-picking season in Southeast Georgia in conjunction with Plaintiff driving away when Defendant first approached him establishes arguable reasonable suspicion.[3] Defendant's position places citizens between a rock and a hard place and cuts against the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures.    Again, Defendant's argument is that during the month of August any person with a bag and a pickup truck is subject to being stopped by police if they choose to drive within two counties of Waycross.    The Fourth Amendment and clearly established law interpreting it do not support such a breathtaking intrusion by law enforcement.

The fact that Plaintiff drove away from Defendant when Defendant walked up to Plaintiff's driver-side window is not enough

---

[3] Defendant states that Plaintiff "abruptly drove away" when Defendant first approached him.  Dkt. No. 21-2 at 4.  When asked at oral argument to explain the reasoning behind this characterization, Defendant stated that when Plaintiff was pulling away there was a loud noise consistent with somebody pulling away very quickly.  While the video does contain a loud noise when Plaintiff moved forward, the loud noise is not from Plaintiff driving over an unidentifiable object, but from Defendant smacking Plaintiff's window with his hand.  Further, the video shows that Plaintiff drove away at an insignificant pace: Plaintiff's truck did not lurch forward; his tires did not squeal; nor was there any other indication that Plaintiff drove away "abruptly."  Rather, Plaintiff's brake lights were on for the three seconds that the video showed Plaintiff driving off, which is consistent with someone driving away at a non-significant speed.

AO 72A
(Rev. 8/82)

to establish arguable reasonable suspicion.  See Fla. v. Bostick,

501 U.S. 429, 437, 111 S. Ct. 2382, 2387, 115 L. Ed. 2d 389 (1991)

("We have consistently held that a refusal to cooperate, without

more, does not furnish the minimal level of objective justification

needed for a detention or seizure."); Fla. v. Royer, 460 U.S. 491,

498 (1983) (plurality opinion) (stating that a person approached

by a police officer "need not answer any question put to him;

indeed, he may decline to listen to the questions at all and may

go on his way," and that the person approached "may not be detained

even momentarily without reasonable, objective grounds for doing

so; and his refusal to listen or answer does not, without more,

furnish those grounds"); WBY, Inc. v. DeKalb Cty., Georgia, 695 F.

App'x 486, 493 (11th Cir. 2017) ("Georgia law clearly provides

that citizens have no freestanding obligation to comply with a

police officer's requests when the officer is not discharging a

lawful duty.  For example, when an officer detains an individual

without reasonable suspicion, the citizen is free to ignore

requests and/or to walk away, and ... no charge of obstruction

[will] lie." (internal quotation marks and citation omitted)

(alteration in original)); U.S. v. Marcelino, 736 F. Supp. 2d

1343, 1348-51 (N.D. Ga. 2010) (finding no reasonable suspicion

when defendant was walking in a well-known, high-crime gang area

and immediately walked away when approached by federal law

enforcement agents).  Defendant did not have arguable reasonable

AO 72A
(Rev. 8/82)

suspicion to detain Plaintiff at that point in time, nor at any other point during the encounter. Accordingly, a reasonable jury could find that Defendant violated Plaintiff's constitutional right to be free from unreasonable seizures.

Defendant's initial brief cites two cases for the proposition that Plaintiff's detention was constitutional. Both cases are materially distinguishable. First, U.S. v. Franklin was an appeal of a denial of a motion to suppress. 323 F.3d 1298 (11th Cir. 2003). Thus, the Eleventh Circuit viewed the facts in the light most favorable to the government. There, the court found that the defendant was in "a problem area, at night, underneath a no loitering sign" and took flight when approached by officers. Id. at 1301. The court noted that the defendant took "flight" which was "particularly suspicious" because he "ran away at full speed as soon as he saw the officers." Id. at 1302. Further, the "duration" of the flight was also significant: the defendant ran behind a building, "climbed a fence, sprinted across a parking lot and began to scale a second fence." Id. The distinctions present in this case are clear.

The second case, United States v. Willis, is also materially distinguishable. 759 F.2d 1486 (11th Cir. 1985). There, law enforcement had reason to believe that a private plane landing late at night at a small airport in a rural area used primarily by private aircraft was loaded with substantial quantities of drugs.

23

Id. at 1490-91.  The defendant approached the small, rural airport late at night in a taxi cab.  Id. at 1492.  The defendant stepped out of the cab, saw police officers and police cars around the private plane, made eye contact with a police officer, and immediately got back in the cab and left the airfield.  Id. at 1492.  Here, Plaintiff's exit was notably different.  Further, the circumstances surrounding the defendant's flight in Willis were *very* suspicious.  Here, they were not.  Plaintiff was sitting in a parked truck, in a public park, in the middle of the day.  As detailed earlier, Defendant had no reason to believe that Plaintiff was engaged or about to be engaged in illegal activity.

In his supplemental brief, Defendant sets forth one more case in an attempt to establish arguable reasonable suspicion, Hargis v. City of Orlando, Fla., 586 F. App'x 493 (11th Cir. 2014).  There an officer was on patrol along International Drive in Orlando, Florida.  Id. at 494.  The patrol was part of an operation to address a recent string of commercial burglaries that were taking place along International Drive in the early morning hours.  Id. At approximately 1:00 a.m. or 2:00 a.m., the officer observed the plaintiff drive slowly from the back of a closed restaurant on International Drive to the front of the restaurant and then turn around and head back the way he had come.  Id.  After observing these actions, the officer activated his lights and pulled the plaintiff over.  Id.  The Eleventh Circuit found arguable

24

reasonable suspicion based on the facts that: "Officer Springer observed a car driving slowly from behind a closed commercial building to the front of the building in the early morning hours in an area he knew to have experienced a recent string of burglaries. Hargis also changed direction and headed back the way he had come, essentially making a full lap of the parking lot." Id. at 499.

The present facts stand in sharp contrast to those in Hargis. Plaintiff here was many miles away from the one berry incident of record. A flattened sleeping bag in a truck bed, without more, does not indicate that the driver trespassed on land to illegally pick berries. In short, Hargis is materially distinguishable.

For these reasons, Defendant's Motion for Summary Judgment with respect to qualified immunity is due to be **DENIED**.

## III. Plaintiff and Defendant are not Entitled to Summary Judgment

To state a claim under 42 U.S.C. § 1983, Plaintiff must prove: "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived a person of rights secured by the Constitution or law of the United States." Morrison v. Washington Cty., Ala., 700 F.2d 678, 682 (11th Cir. 1983). In addition, the causation and damages requirements of common law tort claims apply to § 1983 claims. "The Constitution is the substantive fuel powering § 1983, but its mechanical structure is similar to the common law of Torts. As

25

with any common law tort, Plaintiff must establish an adequate causal link between the alleged harm and the alleged unlawful conduct." Dixon v. Burke Cty., Ga., 303 F.3d 1271, 1274-75 (11th Cir. 2002) (citations omitted). See also Jackson v. Sauls, 206 F.3d 1156, 1168 (11th Cir. 2000) ("[W]e are guided by certain common law tort principles of damages and causation which apply in this § 1983 context."). "For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue." Jackson, 206 F.3d at 1168. Even if Plaintiff cannot establish actual damages, Plaintiff "may recover nominal damages." Kelly v. Curtis, 21 F.3d 1544, 1557 (11th Cir. 1994).

Turning to the issues of causation and damages, neither side is entitled to summary judgment at this point. The Eleventh Circuit has recognized that "[i]n addition to damages based on monetary loss or physical pain and suffering, under the law a § 1983 plaintiff also may be awarded compensatory damages based on demonstrated mental and emotional distress, impairment of reputation, and personal humiliation." Slicker v. Jackson, 215 F.3d 1225, 1231 (11th Cir. 2000). Here, Plaintiff testified that he suffered physical pain and suffering from his sutures coming out during the encounter. Plaintiff also testified that he

suffered emotional distress as a result of the encounter.   In response, Defendant argues that Plaintiff cannot establish that Defendant was the proximate cause and cause-in-fact of Plaintiff's physical and emotional distress damages.   Because, based on this record, a reasonable jury could find for either Defendant or Plaintiff on the issue of causation regarding the alleged physical pain and suffering damages and on the issues of the existence and amount of emotional distress damages, neither party is entitled to summary judgment on these issues.

Viewing the evidence in the light most favorable to Defendant, Plaintiff has not shown as a matter of law that Defendant was the cause-in-fact of Plaintiff's sutures being pulled out.   First, Plaintiff does not know when the sutures got pulled out.   Second, Defendant had limited physical contact with Plaintiff.   Other than handcuffing and unhandcuffing Plaintiff and taking Plaintiff's wallet from Plaintiff's pocket, Defendant did not have physical contact with Plaintiff.   Viewing the evidence in the light most favorable to Defendant, then, a reasonably jury could find that Plaintiff's sutures were naturally pulled out at some point during the encounter and that the sutures more likely than not would have been pulled out whether or not the encounter with Defendant had occurred.   In other words, because a reasonable jury could find that Defendant did not force Plaintiff to do anything out of the ordinary, a reasonable jury could also find that it was more likely

than not that the sutures were so loose that they would have been pulled out with or without the encounter with Defendant.

Furthermore, viewing the evidence in the light most favorable to Defendant, based on this record a reasonable jury could find that Plaintiff has not adequately proven emotional distress damages. Other than Plaintiff's testimony that he was embarrassed, traumatized, shocked, and afraid of getting shot, Plaintiff has not provided evidence of mental or emotional distress.  In addition, the Court is unable to award Plaintiff emotional distress damages as a matter of law, because Plaintiff has not proven the amount of these damages as a matter of law.  Accordingly, whether Plaintiff is entitled to emotional distress damages, and if so, how much compensation Plaintiff is entitled to, are matters to be determined by a jury.

Turning to Defendant's Motion for Summary Judgment, a reasonable jury could find that Defendant was the cause-in-fact and proximate cause of physical pain and suffering stemming from Plaintiff's sutures being pulled out.  First, a reasonable jury could determine that Defendant forcing Plaintiff out of his truck caused Plaintiff to exit his truck in a manner that caused the sutures to pull out.  Plaintiff testified that the sutures likely got pulled out when Plaintiff exited his truck; a reasonable jury could agree with this testimony.  And although Plaintiff had to exit his truck at some point (he was not going to spend the rest

of his life in it), a reasonable jury could find that without Defendant forcing Plaintiff out of the truck, it is more likely than not that Plaintiff would have exited the truck in a manner that would not have pulled out the sutures. Thus, a reasonable jury could find that Defendant was the cause-in-fact of Plaintiff's sutures being pulled out. Turning to the emotional distress damages, a reasonable jury could believe Plaintiff's testimony that he suffered emotional distress because of Defendant's unlawful actions.

Further, a reasonable jury could find that Defendant was the proximate cause of Plaintiff's sutures being pulled out and Plaintiff's emotional distress (if Plaintiff suffered any). To establish proximate cause, the plaintiff must show that "the injury or damages was a reasonably foreseeable consequence of the act or omission." Jackson, 200 F.3d at 1168 n.16. First, a reasonable jury could find that forcing someone out of a vehicle could aggravate that person's injuries. Such a finding does not impact Defendant's ability to do his job, because if Defendant had reasonable suspicion that Plaintiff was engaged, or about to engage, in criminal activity, then Defendant would be immune from liability for aggravating injuries when forcing suspects out of vehicles. But here, Defendant is not entitled to qualified immunity and a reasonable jury could find that Defendant's actions could foreseeably aggravate pre-existing medical conditions. The

AO 72A
(Rev. 8/82)

situation was tense, and Plaintiff testified that Defendant had his hand on or near his gun at many points prior to ordering Plaintiff from the truck.   Under these circumstances, it is reasonable to infer that a person would not exit his or her vehicle as cautiously as he or she normally would, causing injuries to be aggravated.   Thus, a reasonable jury could find proximate cause regarding Defendant's actions and Plaintiff's physical pain and suffering.   Second, a reasonable jury could find proximate cause with regard to any emotional or mental distress suffered by Plaintiff.   A reasonable jury could find that a foreseeable result of detaining a person without reasonable suspicion is that the person may suffer emotional or mental distress.

Finally, a reasonable jury could believe Plaintiff's testimony that he suffered pain and suffering as a result of his sutures being pulled out and that he suffered emotional distress from the encounter.   If a reasonable jury finds either of these things, then it could also reasonably award Plaintiff compensatory damages.

Because neither Plaintiff nor Defendant can prove causation, or the lack thereof, and damages, or the lack thereof, as a matter of law, both parties' motions for summary judgment are due to be **DENIED**.

AO 72A
(Rev. 8/82)

## CONCLUSION

For these reasons, Plaintiff's motions for summary judgment, dkt. nos. 5, 19, and Defendant's Motion for Summary Judgment, dkt. no. 21, are **DENIED**.

**SO ORDERED**, this 19th day of March, 2019.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)